## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**JEANNETTE RAMÍREZ**,
    Plaintiff,

    v.

**COMMISSIONER OF SOCIAL
SECURITY**,
    Defendant.

Civil No. 19-1537 (BJM)

## OPINION AND ORDER

Jannette Ramírez ("Ramírez") seeks review of the Social Security Administration Commissioner's ("the Commissioner's") finding that she is not entitled to disability benefits under the Social Security Act ("the Act"), 42 U.S.C. § 423. Ramírez contends that the administrative law judge ("ALJ") wrongly concluded that Ramírez had the residual functional capacity ("RFC") to perform the full range of sedentary work and that the ALJ failed to give proper weight to the findings, diagnoses, and opinions of treating physicians. Docket No. ("Dkt.") 15. The Commissioner opposed. Dkt. 18. This case is before me by consent of the parties. Dkt. 10. For the reasons set forth below, the Commissioner's decision is **REVERSED** and **REMANDED**.

## STANDARD OF REVIEW

After reviewing the pleadings and record transcript, the court has "the power to enter a judgment affirming, modifying, or reversing the decision of the Commissioner." 20 U.S.C. § 405(g). The court's review is limited to determining whether the Commissioner and his delegates employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro v. Sec'y of Health & Hum. Services*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C.§ 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v. Sec'y of Health & Hum. Services*, 955 F.2d 765, 769 (1st Cir. 1991). Substantial evidence means "'more than a mere

scintilla.' . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)) (internal citation omitted). The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán v. Sec'y of Health & Hum. Services*, 819 F.2d 1, 3 (1st Cir. 1987).

A claimant is disabled under the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, all of the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

The Commissioner employs a five-step evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520; see *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Goodermote v. Sec'y of Health & Hum. Services*, 690 F.2d 5, 6-7 (1st Cir. 1982). At Step One, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At Step Two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(c). If not, the disability claim is denied. At Step Three, the Commissioner must decide whether the claimant's impairment is equivalent to a specific list of impairments contained in the

regulations' Appendix 1, which the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1. If the claimant's impairment meets or equals one of the listed impairments, he is conclusively presumed to be disabled. If not, the evaluation proceeds to Step Four, through which the ALJ assesses the claimant's RFC and determines whether the impairments prevent the claimant from doing the work he has performed in the past.

An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e) and 404.1545(a)(1). If the claimant can perform his previous work, he is not disabled. 20 C.F.R. § 404.1520(e). If he cannot perform this work, the fifth and final Step asks whether the claimant can perform other work available in the national economy in view of his RFC, as well as age, education, and work experience. If the claimant cannot, then he is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

At Steps One through Four, the claimant has the burden of proving he cannot return to his former employment because of the alleged disability. *Rodríguez v. Sec'y of Health & Hum. Services*, 944 F.2d 1, 5 (1st Cir. 1991). Once a claimant has done this, the Commissioner has the burden under Step Five to prove the existence of other jobs in the national economy the claimant can perform. *Ortiz v. Sec'y of Health & Hum. Services*, 890 F.2d 520, 524 (1st Cir. 1989). Additionally, to be eligible for disability benefits, the claimant must demonstrate that his disability existed prior to the expiration of his insured status, or his date last insured. *Cruz Rivera v. Sec'y of Health & Hum. Services*, 818 F.2d 96, 97 (1st Cir. 1986).

## BACKGROUND

The following facts are drawn from the transcript ("Tr.") of the record of proceedings.

Ramírez was born on May 26, 1970. Tr. 124. She grew up in Puerto Rico, moving to Jacksonville, Florida at age 22. Tr. 146. She has a high school education. Tr. 119. She reads, speaks,

and writes in English. *Id*. Her most recent employment was as a maintenance worker performing largely janitorial work in Jacksonville. Tr. 144.

On September 16, 2013, Ramírez applied for disability benefits, claiming an onset date of March 1, 2012; her date last insured would be December 31, 2016. Tr. 116, 367. The Commissioner denied Ramírez's claim initially, on reconsideration, and after a hearing before an ALJ. Tr. 125, 377, 390. The record before the Commissioner, which included medical evidence and Ramírez's self-reports, is summarized below.

### A. Medical History

On March 20, 2012, Dr. John Cintron examined Ramírez after she had been referred for a possible stroke; she was slurring her speech and exhibiting facial weakness and numbness. Tr. 701-02. At first Ramírez exhibited systolic blood pressure in the 260s, but this slowly lowered and stabilized over time while Dr. Cintron monitored her. *Id*. Dr. Cintron suspected that Ramírez had experienced an acute small vessel ischemic stroke manifested by left facial weakness. *Id*. She also had dysarthria, uncontrolled hypertension, smoked tobacco, and had a family history of vascular disease, as her father had experienced coronary artery disease and had undergone bypass surgery. *Id*. Dr. Mauricio Buendia examined Ramírez on the same day and assessed her with having had a hypertensive emergency and previous cerebrovascular accident. Tr. 698. He also noted that she had elevated cardiac enzymes, stage B heart failure with moderate concentric left ventricular atrophy, and was a chronic active smoker. *Id*. His primary diagnosis of her was an unspecified cerebral artery occlusion with cerebral infarction. Tr. 678.

On April 9, 2012, Dr. Buendia examined Ramírez again and assessed her with the same conditions. Tr. 628-29. However, Buendia also noted that Ramírez was cardiovascularly stable and asymptomatic and that her blood pressure was much better controlled. *Id*. On August 2, 2012, Dr. Buendia examined her yet again. Tr. 625-27. At the time, Ramírez self-reported headaches and elevated blood pressure. *Id*. Dr. Buendia assessed her with uncontrolled hypertension with accompanying heart disease. *Id*. On August 16, 2012, he reported essentially the same findings. Tr. 622-24. On September 20, 2012, he reported that her blood pressure was slightly improved. Tr.

619-21. On October 17, 2012, Ramírez self-reported that she was feeling much better and that her blood pressure was doing much better at home; Dr. Buendia also found that her blood pressure was doing much better. Tr. 616-618.

From December 3 through December 6, 2012, Ramírez was admitted to Hospital Metropolitano, where she was diagnosed with renovascular hypertension and left renal artery stenosis. Tr. 636. On December 13, 2012, cardiologist Dr. Edwin Perez Marrero noted that Ramírez had a history of stroke secondary to malignant hypertension and diagnosed her with bilateral renal stenosis, referring her for a percutaneous transluminal angioplasty and left renal artery stent. Tr. 763. Dr. Perez found that her right renal artery had 50% stenosis while the left had 80% stenosis. *Id*.

Ramírez went to the Cardiovascular Center of Puerto Rico and the Caribbean on January 3, 2013 as she prepared to have the left renal artery stent put in at the same location a week later. She was noted to have hyperlipidemia. Tr. 562. However, she had normal vascularity in her kidneys and no evidence of left renal artery pseudoaneurysm at the time. Tr. 569. She had the stent put in on January 10, 2013. Tr. 812. On January 11, 2013, a radiologist noted that she still had normal vascularity in her kidneys and no evidence of left renal artery pseudoaneurysm. Tr. 814.

Over the following months, Dr. Perez acknowledged that Ramírez had hypertension and lupus on several separate occasions. On February 4, 2013, Dr. Perez and Dr. Yasmeen Smadi assessed her hypertension as controlled. Tr. 761-62. On March 26, 2013, on the other hand, Dr. Perez noted that her hypertension was uncontrolled. Tr. 760-61. On April 5, 2013, Dr. Perez stated that Ramírez's hypertension was back under control, but also noted multiple episodes of palpitation and tachycardia. Tr. 759. On May 3, 2013, Dr. Perez said that her hypertension was controlled, but also stated that she had systemic lupus erythematosus ("SLE") and antiphospholipids syndrome. Tr. 758. Dr. Perez repeated those findings on June 14, 2013. Tr. 756-57. On September 13, 2013, Dr. Perez again assessed her with uncontrolled hypertension as well as SLE and antiphospholipids syndrome; Dr. Perez and Dr. Smadi made a plan to put her on coumadin (Warfarin) therapy and increase her Hyzaar prescription. Tr. 755-56, 842-43.

On June 20, 2013, Dr. Angel Torres Rivera conducted an MRI on Ramírez, stating that findings were normal except for chronic lacunar infarcts of the basal ganglia, left thalamus, and right sided pons. Tr. 9, 776. Two months later, from August 19-24, Ramírez was admitted to Hospital Hermanos Melendez with profuse vaginal bleeding that had been ongoing for many days. Dr. Michelle Diaz found that she was symptomatic with abnormal uterine bleeding and was in a hypercoagulated state, perhaps due to the fact that she was taking Warfarin. Tr. 642. By the time Ramírez was discharged, her bleeding had stopped and her prognosis was good. On October 17, 2013, Dr. Jenario Pagan found multiple calcified granulomata at Ramírez's left upper lobe; her findings otherwise seemed normal. Tr. 556. Dr. Perez assessed Ramírez again on December 13, 2013, and noted, among other things, that she had a history of renal stenosis but no complaints that arose after the stent was inserted. Tr. 841. On January 27, 2014, Dr. Michael Babilonia examined Ramírez and noted that her hands had fully normal function and muscular strength. Tr. 827. He also found that she had a normal gait with no limping. Tr. 828.

On February 24, 2014, a state agency consultative examiner, Dr. Jose Cuebas, determined that Ramírez was not disabled. Tr. 376. In reaching this determination, he found that she had the RFC to perform a wide range of sedentary work. Tr. 373. Dr. Cuebas noted that Ramírez had difficulty walking, sitting, kneeling, concentrating, and following instructions. *Id*. He also noted that she had systemic lupus erythematosus and hypertensive vascular disease; her medically determinable impairments could reasonably be expected to produce her pain or other symptoms; and the intensity, persistence, and functionally limiting effects of her symptoms are substantiated by the objective medical evidence alone. Tr. 374-75. In assessing her RFC, he found without explanation that she could frequently lift and/or carry 10 pounds; could stand and/or walk with normal breaks for a total of four hours; and could sit with normal breaks for a total of about six hours in an eight-hour workday. *Id*. He noted that she could also perform most other activities occasionally, but that she could not perform her past relevant work. *Id*.; Tr. 373. Dr. Cuebas found that Ramírez's condition was severe and that her claimant statement was partially credible, but he found her not to be disabled. Tr. 376.

On April 7, 2014, Dr. Jenaro Pagan Lagomarsini assessed Ramírez and noted she had hypertensive chronic kidney disease Stage III, a history of cardiovascular accidents, left renal sclerosis, systemic lupus erythematosus with antiphospholipid syndrome, renal atherosclerosis, and aortic atherosclerosis. Tr. 837. Dr. Pagan's plan included putting her on Labetalol, Losartan, and Simvantatin. On May 9, 2014, Ramírez saw Dr. Scott Guttovitz with heavy vaginal bleeding; Dr. Guttovitz noted that she had a history of hypertension, anemia, antiphospholipid syndrome, and strokes. Tr. 850-51. Ramírez's documented medications included Coumadin, Zocor, aspirin, hydroxychloroquine, labetalol, losartan-hydrochlorothiazide, and prednisone; her inpatient medications included Cozaar, hydrodiuril, Tylenol, zocor, Zofran, hydroxychloroquine, and labetalol. *Id*.; Tr. 860.

On June 5, 2014, Dr. Smadi examined Ramírez's heart post-left renal artery stenting and found that her right renal artery had under 50% stenosis. Tr. 1123. Dr. Smadi noted that there were indications that Ramírez had benign hypertension and renal disease. *Id*. On June 18, 2014, Dr. Pagan conducted a renal ultrasound on Ramírez and noted an impression of tiny right cortical cysts. Tr. 941. On June 27, 2014, Dr. Perez assessed her with benign essential hypertension, atherosclerosis of a renal artery, systemic lupus erythematosus, hypertensive chronic kidney disease, and secondary hypercoagulable state. Tr. 937. On July 3, 2014, Dr. Pagan saw Ramírez again and noted an impression of atheromatous vascular disease. Tr. 1121. There were apparently numerous tiny punctate densities throughout Ramírez's pulmonary fields bilaterally. *Id*. Dr. Pagan thought that the densities might be tiny, calcified granulomata, but he could not exclude other possibilities, as the densities were too small to characterize. *Id*. He recommended a follow-up examination. *Id*. However, it is unclear if one was ever conducted.

On August 7, 2014, another state agency consultative examiner, Dr. Figueroa, affirmed the previous consultant's determination that Ramírez was not disabled as written. Tr. 386. Dr. Figueroa noted that worsening in Ramírez's condition had not been alleged and that evidence in the file did not suggest worsening of her physical condition. *Id*.

On October 1, 2014, Ramírez was admitted to Hospital Metropolitano with anemia; she was diagnosed with symptomatic anemia and lupus, among other things. Tr. 967. On February 9, 2015, Dr. Perez saw Ramírez during a followup visit after she had suffered from anemia due to menstrual bleeding. Tr. 1067. Her blood pressure was 143/94. *Id*. Dr. Perez assessed Ramírez with benign essential hypertension, atherosclerosis of a renal artery, systemic lupus erythematosus, hypertensive chronic kidney disease, and secondary hypercoagulable state. Tr. 1067-68. The medications she was taking included Labetalol, Hyzaar, Plaquenil, Prednisone, Coumadin, and aspirin. *Id*.

On September 21, 2015, Dr. William Hurtado noted that Ramírez had active essential/arterial hypertension and that he would adjust her medication accordingly. Tr. 1156.

On September 28, 2015, Ramírez conducted a followup visit with Dr. Perez. Tr. 1043. Her blood pressure was 138/87. *Id*. Dr. Perez again assessed her with benign essential hypertension, atherosclerosis of a renal artery, systemic lupus erythematosus, hypertensive chronic kidney disease, and secondary hypercoagulable state; he recommended that she continue with the same medical management. Tr. 1043-44. The medications Ramírez was on were largely the same as at her previous visit to Dr. Perez, but also included folic acid, Baclofin, Zocor, and Lisinopril. *Id*.

On October 5, 2015, radiologist Dr. Jorge Torres Nazario conducted a renal ultrasound on Ramírez. Tr. 1042, 1120. He observed that her right kidney was normal, but that her left kidney was small with a slight increase in echogenicity, which is suggestive of a partially atrophic kidney. *Id*. The portions of the abdominal aorta and inferior vena cava that Dr. Torres could see were normal. *Id*. Ramírez saw Dr. Pagan again on November 3, 2015 for joint pain; he assessed her with chronic kidney disease, Stage III; lupus anticoagulant syndrome; hypertensive chronic kidney disease; and drug-induced bilateral cateracts. Tr. 1100. Dr. Perez conducted another followup with Ramírez on March 11, 2016. Tr. 1032. Her blood pressure was 131/83. Id. He no longer noted atherosclerosis or secondary hypercoagulable state, but diagnosed her with essential hypertension (no longer noting it as benign) and lupus anticoagulant syndrome, as well as noting her current and long-term use of anticoagulants and her tobacco use. Tr. 1032-34. He also noted that she was taking

most of the same medications as before as well as Tramadol and continued her on the same medical management. *Id*.

On June 16, 2016, Ramírez met again with Dr. Hurtado, who noted that she had chronic kidney disease, Stage III; systemic lupus erythematosus; hypertensive chronic kidney disease; microscopic hematuria; anemia; and nicotine dependence. Tr. 1144. Dr. Hurtado stated that Ramírez complained of an occasional irregular heartbeat, abdominal pain, nausea, blurred vision, foamy urine, bone pain, articular swelling or pain, and weakness and pain in her lower extremities. Tr. 1145-46. He found that she had pale conjunctivae, suffered from a lack of concentration, had mild loss of strength in her left side, suffered from some balance problems occasionally, and had ecchymotic lesions that were probably due to her Warfarin use in her lower extremities. *Id*. He also found that she had controlled arterial hypertension, though only at Stage I. Tr. 1147.

Dr. Perez conducted yet another follow-up visit with Ramírez on September 14, 2016. Tr. 1023. Her blood pressure was 110/75. *Id*. She was apparently on most or all of the same medications except for Baclofin. Tr. 1023-24. Dr. Perez assessed her with congenital renal artery stenosis, lupus anticoagulant syndrome, systemic lupus erythematosus, hypertensive chronic kidney disease, long-term (current) use of anticoagulants, and tobacco use; he continued her on the same medical management. *Id*. On September 20, 2016, Ramírez saw Dr. Pagan due to general weakness. Tr. 1096. He assessed her with chronic kidney disease, Stage III; lupus anticoagulant syndrome; hypertensive chronic kidney disease; and drug-induced bilateral cateracts. *Id*.

On October 11, 2016, Ramírez met yet again with Dr. Hurtado, who diagnosed her chronic kidney disease at Stage IV. Tr. 1137. He otherwise came to the same findings that he had made at her previous visit. Tr. 1138-40. Finally, Dr. Smadi conducted a sonogram on Ramírez on October 19, 2016, and found that she had no evidence of right renal stenosis and less than 50% left renal stenosis close to three years after her stent placement. Tr. 1174.

### B.  ALJ Proceedings

On November 2, 2016, Ramírez appeared for a hearing via video before an ALJ. Tr. 114. She testified that she had completed the 12th grade and had obtained her high school diploma; she

also testified that she could speak English, having lived in Jacksonville, Florida from the age of 22 until the age of 42. Tr. 146-47. Ramírez testified that her language abilities in both Spanish and English were hampered by her inability to find the right word at times. Tr. 145. Ramírez had previously worked as a maintenance worker, performing tasks like taking out garbage, cleaning bathrooms and desks, dusting, and mopping. Tr. 145. Ramírez stated that her main complaint at present was constant changes in blood pressure, which caused pain and swelling in her feet, legs, and bones when moving objects or completing certain chores like sweeping and vacuuming. Tr. 151. Ramirez also noted that if she sat or stood for more than around half an hour, her legs would become swollen and start to hurt. Tr. 152. Though Ramírez lived alone, her mother completed most household chores for her, although Ramírez was able to do her own laundry. Tr. 149-50. Ramírez's mother had driven her to the hearing, as Ramírez feared driving since purportedly having a stroke while still living in Florida. Tr. 148-49.

Other individuals also testified about Ramírez before the ALJ. A psychologist, Dr. Jimenez, offered her opinion that Ramírez did not meet or equal any of the Commissioner's listings within her area of expertise; Ramírez's counsel noted that he agreed with this assessment. Tr. 153-54. A vocational expert ("VE") also testified. Tr. 154. In response to a hypothetical posed by Ramírez's counsel, the VE stated that a person who needs to alternate positions between sitting, standing and possibly walking would have her occupational base for the full range of sedentary work eroded. Tr. 156. The VE went on to clarify that the extent of the erosion would depend on the facts of the case, such as frequency of the need to alternate sitting and standing. Tr. 157. The VE then noted that a person who had to alternate positions between sitting and standing every half hour would not be able to perform a sedentary job on a sustained basis and would therefore not be able to keep the pace of production required by the national economy. Tr. 157.

The ALJ announced his decision on December 6, 2016. Tr. 125. He determined that Ramírez had not engaged in substantial gainful activity since March 1, 2021, her alleged onset date, and that her date last insured would be December 31, 2016. Tr. 116. The ALJ found that Ramírez had the severe impairments of systemic lupus, hypertension, chronic kidney disease

(stage III), and anemia. Tr. 116. However, the ALJ held that Ramírez did not have an impairment or combination of impairments that met or medically equaled Listings 6.00 (impairment of renal function), 14.02 (systemic lupus erythematosus), 7.02 (chronic anemia), 4.00 (which references and somewhat explains hypertension, otherwise unlisted), and 11.04 (central nervous system vascular accident). Tr. 118-19.

The ALJ then made the RFC determination that Ramírez could perform the full range of sedentary work. Tr. 119. In doing so, the ALJ noted that while Ramírez's impairments could reasonably be expected to cause the alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of those symptoms were not fully consistent with evidence in the record. Tr. 120. Specifically, the ALJ emphasized that Ramírez's symptoms were stable, her impairments were manageable with treatment, and her findings were largely normal. Tr. 120-23. In doing so, the ALJ drew upon the assessments of many of Ramírez's former attending and treating doctors, including assessments by Dr. Buendia, Dr. Quintero, Dr. Pagan, Dr. Guttovitz, Dr. Hurtado, Dr. Babilonia, and several assessments by Dr. Perez. Tr. 120-23. The ALJ placed particular stress upon the idea that Ramírez's symptoms had not worsened over time. Tr. 123.

When addressing opinion evidence offered by Ramírez's doctors and examiners, the ALJ specifically accorded only "partial weight" to a March 21, 2012 assessment by Dr. Cintron where Dr. Cintron expressed the suspicion that Ramírez had had an acute small vessel ischemic stroke; the ALJ did so because he felt the assessment merely referred to an acute condition that improved with treatment and because Dr. Cintron only had a short treating relationship with Ramírez. Tr. 123. The ALJ instead accorded "great weight" to a January 27, 2014 examination by Dr. Babilonia that included an electrocardiogram with normal findings; an x-ray revealing no consolidations or effusions and multiple punctate nodules bilaterally too small to characterize; and normal findings including normal heart rhythm, no cardiomegaly, no arrythmia, no murmur or gallop, normal gait, and 5/5 strength in Ramírez's lower and upper extremities. Tr. 123. The ALJ afforded Dr. Babilonia's opinion (and Dr. Figueroa's adoption of his opinion) greater weight than Dr. Cintron's assessment in part because Dr. Babilonia "supported his opinion with a proper explanation" and

because he was familiar with the Social Security Administration's disability programs, rules, and regulations. Tr. 123.

The ALJ also stated that he accorded "significant weight" to the opinion offered by Dr. Jimenez at the hearing for Ramírez, since she served as an impartial medical expert whose testimony was consistent with the overall record. Tr. 123. The ALJ characterized Dr. Jimenez's opinion as being that Ramírez's impairments did not meet or equal any listing whatsoever. Tr. 123.

Next, the ALJ found that Ramírez could not perform her past work. Tr. 124. However, based on the testimony of the VE and Medical-Vocational Rule 201.27 as set forth in 20 CFR Part 404, Subpart P, Appendix 2, the ALJ found that Ramírez could perform other work existing in significant numbers in the national economy. Tr. 124. Accordingly, the ALJ found that Ramírez was not disabled under the Act. Tr. 125.

The Appeals Council denied review, Tr. 8, and this action followed.

## DISCUSSION

Ramírez raises the following three arguments: 1) that the ALJ erroneously discounted the findings and opinions of Ramírez's treating physicians with regards to Ramírez's cardiovascular issues; 2) that the ALJ erroneously concluded that Ramírez had the RFC to perform the full range of sedentary work while ignoring a particular hypothetical posed to the VE; and 3) that the ALJ wrongly determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment from 20 CFR Part 404.

The third argument is dismissed due to Ramírez's failure to develop the claim. Ramírez notes cursorily that the ALJ's determination that Ramírez's conditions did not meet any listings was wrong, but Ramírez fails to offer any explanation as to why or provide any evidence in support of this claim. *See* Dkt. 15 at 8. Since Ramírez does not provide enough information to allow me to evaluate her argument, Ramírez's third argument fails. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

Ramírez's first and second arguments merit more careful consideration. I will address each in turn below.

### A.  Ramírez's Cardiovascular Issues as a Severe Impairment

For her first argument, Ramírez claims that her cardiovascular incidents were a progressive and continual severe impairment that worsened instead of stabilizing or improving. This is in response to the ALJ finding at Step Two that Ramírez's cardiovascular incidents did not constitute a severe impairment. An impairment or combination of impairments is not severe if it does not significantly limit an individual's physical or mental ability to do basic work activities. C.F.R. § 404.1522. Basic work activities are "the abilities and aptitudes necessary to do most jobs." *Id*. At Step Two, the burden is on the claimant to show that they have an impairment or combination of impairments that significantly limits their physical or mental ability to do basic work activities.

It appears to be undisputed that Ramírez's cardiovascular conditions were fairly severe when they first arose. Though Ramírez was never officially diagnosed as having had a stroke and the ALJ never explicitly acknowledged the probability that she had suffered one, Dr. Cintron's suspicion that Ramírez suffered an acute small vessel ischemic stroke in early 2012 seems extremely probable.

However, in arguing that her cardiovascular issues constituted a progressive impairment that worsened with time, Ramírez cites only minimal evidence that she suffered from more than relatively minor cardiovascular issues post-2013. Additionally, Ramírez somewhat mischaracterizes the evidence that she does reference.[1] Ramírez cites medical documentation showing that she still suffered from hypertension after 2013; in particular, she references the fact

---

[1] In addition to arguing that she suffered from hypertension post-2013, Ramírez claims that in May 2014, a renal artery study revealed that she had 50% right main renal artery stenosis. This is false; the study only revealed that she had *less* than 50% stenosis. Ramírez also claims that a chest CT from July 2014 revealed that she had atheromatous vascular disease and "numerous densities." In reality, Dr. Pagan only noted that his "impression" was that Ramírez may have atheromatous vascular disease and that there were "numerous tiny punctate densities throughout the pulmonary fields bilaterally" that were "too small to characterize." Dr. Pagan then recommended a follow-up examination. The ALJ weighed these findings in his analysis and treated the CT as actually revealing atheromatous vascular disease, thereby arguably giving the claims more weight than they truly deserved. Tr. 121-22.

that in 2015, Dr. Hurtado noted that Ramírez had a case of uncontrolled hypertension. However, Dr. Hurtado stated that he would adjust Ramírez's medication accordingly, and in subsequent interactions with Ramírez in 2016, Dr. Hurtado noted that her hypertension was under control.

The ALJ references substantial evidence suggesting that Ramirez's cardiovascular condition did not unduly affect her in the long term. In his analysis, the ALJ did not deny that Ramírez suffered from an impairment or that her cardiovascular issues were serious at their onset. Instead, the ALJ found that Ramírez's general cardiovascular condition was medically managed and amenable to proper medical control while also noting that Ramírez's potential stroke was an acute condition that improved with treatment, particularly after stenting. Tr. 117, 120, 123; *see* Tr. 814, 1123, 1174. The ALJ also did not deny Dr. Cintron's assessment; he merely found that since Dr. Cintron was treating an acute condition that improved, Dr. Cintron's opinion did not merit undue weight in the ALJ's analysis. The record reflects that Ramírez's cardiovascular condition was more or less stable and did not unduly affect her day-to-day functionality or ability to work. In particular, the record does not suggest that Ramírez had trouble sitting or standing for long periods of time due either specifically or in part to her cardiovascular issues. The ALJ was therefore justified in finding that Ramírez's cardiovascular issues did not constitute a severe impairment.

Again, this court's review is limited to determining whether the Commissioner and his delegates employed the proper legal standards and found facts upon the proper quantum of evidence; the Commissioner's findings of fact are conclusive when supported by substantial evidence, or such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Rodríguez Pagán*, 819 F.2d at 3 (the court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence."). On this issue at least, the ALJ employed the proper legal standards and found facts upon the proper quantum of evidence. As a result, Ramírez's first argument fails.

### B.  Ramírez's Ability to Perform the Full Range of Sedentary Work

Ramírez also claims that the ALJ erred in concluding that Ramírez had the RFC to perform the full range of sedentary work and ignored the answer to a particular hypothetical that Ramírez's

counsel posed to the VE. The gist of Ramírez's claim is that she is not capable of the full range of sedentary work because the ALJ's analysis should have accounted for her (supposed) need to frequently alternate between sitting and standing throughout the day. *See* Dkt. 15 at 11-12.

Under a Social Security Policy Interpretation dealing with implications of an RFC for less than a full range of sedentary work, SSR 96-9p, "[i]n order to perform a full range of sedentary work, an individual must be able to remain in a seated position for approximately 6 hours of an 8-hour workday, with a morning break, a lunch period, and an afternoon break at approximately 2-hour intervals." SSR 96-9p notes that "[w]here the need [to alternate sitting and standing] cannot be accommodated by scheduled breaks and a lunch period, the occupational base for a full range of unskilled sedentary work will be eroded." Ramírez argues that since she cannot remain seated indefinitely, the ALJ erred by not providing a specific assessment as to the frequency of her need to alternate sitting and standing. Under SSR 96-9p, if an individual's need to alternate between sitting and standing "cannot be accommodated by scheduled breaks and a lunch period," then "[t]he RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing." The ALJ did not include such an assessment in finding that Ramírez was capable of the full range of sedentary work.

However, the ALJ is not necessarily required to provide a specific assessment as to the frequency of an individual's need to alternate between sitting and standing. SSR 96-9p arguably only deals with situations where an individual is capable of less than the full range of sedentary work. The ALJ found that Ramírez was capable of the full range of sedentary work, so the requirement that the RFC assessment be specific as to the individual's need to alternate sitting and standing would not apply.[2] Additionally, while the ALJ did not explicitly find how long Ramírez could sit in a given day, since the ALJ found that Ramírez had the RFC for the full range of

---

[2] *But see, e.g.*, *Verstraete v. Astrue*, 2013 WL 238193, at *5 (D.Kan., 2013) (holding that "the RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing when plaintiff is limited to light or sedentary work" and collecting related cases, though seemingly only citing to cases in which the ALJ indicated that the claimant needed a "sit/stand option," or in other words less than a full range of work).

sedentary work, he clearly believed that Ramírez had the RFC to remain in a seated position for at least approximately 6 hours of an 8-hour workday with normal breaks.

The issue, in the end, is whether the ALJ's finding that Ramírez had the RFC for the full range of sedentary work is supported by substantial evidence. Ramírez has the burden of proof at Step Four, but she is not required to take a role in developing the evidence for an RFC finding in her favor, although she is responsible for providing relevant evidence. 20 C.F.R. § 404.1545.

Title 20 of the Code of Federal Regulation's § 404.1529 outlines how the ALJ is supposed to evaluate symptoms cited by claimants. First, a claimant must have an impairment that can be shown via objective medical evidence from an accepted medical source: a claimant will not be found to be disabled if she can only cite subjective evidence. Second, the impairment must be able to reasonably be expected to produce the claimant's symptoms. Third, the ALJ is supposed to consider the intensity, persistence, and limiting effects of the claimant's symptoms. Theoretically, the ALJ will consider objective medical evidence as well as 1) the claimant's daily activities; 2) the location, duration, frequency, and intensity of their symptoms; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate their symptoms; 5) treatment, other than medication, received for relief of their symptoms; 6) any measures used to relieve symptoms; and 7) other factors concerning functional limitations and restrictions due to pain or other symptoms.

The record includes multiple impairments that meet the first two steps or sets of criteria under § 404.1529. The ALJ acknowledged that Ramírez has several impairments that can be shown by objective medical evidence from an accepted source. *See, e.g.*, Tr. 116. Furthermore, it appears entirely reasonable that certain of these impairments, such as Ramírez's lupus, hypertension, kidney disease, or anemia, could produce Ramírez's relevant symptoms (such as the swelling that plays a role in her having difficulty sitting or standing for too long). As a result, the ALJ should have proceeded to consider both the objective medical evidence and the other factors cited at the third step within § 404.1529.

To be sure, the ALJ considered the record in some detail before determining Ramírez's RFC. In finding that Ramírez had the RFC for the full range of sedentary work, the ALJ stated that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms," but then found that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." Tr. 120. The ALJ then outlined large portions of the record in fair detail, which he ultimately summarized by saying that "the record reveals that the claimant's treating doctors have assessed that her condition is stable" and that "the record reveals that the claimant largely revealed normal findings during examinations"; however, the ALJ also noted that "the claimant's allegations of loss of functioning are partly consistent with the evidence of record." Tr. 123.

However, the ALJ failed to explain how the conclusion that Ramírez had certain "normal findings" and how a "stable" condition would allow Ramírez to perform a full range of sedentary work. The ALJ did cite findings almost at random from Ramírez's dozens of doctor's visits that were in fact normal or at least suggested improvement in certain of her symptoms, but he nevertheless failed to explain how the record shows largely "normal" findings when Ramírez's doctors consistently noted that she faces issues like hypertension (controlled or uncontrolled), systemic lupus erythematosus, and chronic kidney disease. Furthermore, the ALJ did not clarify why it would be proper to overlook an abnormal finding and conclude that Ramírez could perform sedentary work even if all of her other findings were normal: even one abnormal finding or condition, including some of the conditions that Ramírez's doctors said that she had, could potentially lead to Ramírez being unable to sit for long periods of time. The ALJ also did not explain the connection between finding that Ramírez's condition was stable and the idea that despite her claims, she had the capacity to sit without changing positions for at least two hours at a time. Stability alone, of course, does not equate to adequate health or increased ability. In short, the ALJ's conclusions need to be more fully explained and applied to the facts relevant to Ramirez's ability to sit for extended periods of time.

Also, the record also does not reveal a history of largely normal findings or good health on the part of Ramírez despite the ALJ's conclusions. The ALJ did establish that some of Ramírez's symptoms, such as her cardiovascular issues, became more controlled over time. However, the ALJ failed to address countervailing considerations, such as Ramírez's worsening kidney disease, *see, e.g.*, Tr. 1096, 1137, beyond making some cursory references. Additionally, medical evidence of record from 2016 but prior to the ALJ hearing went mostly or entirely unreferenced by the ALJ, even though on multiple occasions in 2016, Dr. Hurtado found that Ramírez suffered from lack of concentration, mild loss of strength in left side, some balance problems, and ecchymotic lesions most likely due to Warfarin use in her lower extremities, symptoms that individually or together might suggest that she would have trouble sitting or standing for extended periods of time. Such findings do not necessarily make it clear that Ramírez is unable to sit for six hours a day, but they are neither normal nor healthy.

Additionally, the ALJ unduly assigned significant weight to opinion evidence that was inherently limited in its scope in concluding that Ramírez had the RFC for the full range of sedentary work. In reaching his RFC determination, the ALJ stated that he accorded "significant weight" to the opinion of Dr. Jimenez that Ramírez's impairments do not meet or equal a listing. However, Dr. Jimenez is a psychologist who merely testified that Ramírez did not meet or equal a listing within her area of expertise. It is unclear why the ALJ accorded any weight at all to the opinion of a psychologist in determining Ramírez's RFC when Ramírez's mental and psychological faculties are not at issue and the psychologist neither cited any direct evidence nor offered any claims as to Ramírez's physical functional capacity.

The ALJ also provided little analysis of the overall intensity, persistence, and limiting effects of many of Ramírez's symptoms; he made some reference to but provided no analysis of Ramírez's daily activities or medications she took at the time of the hearing; and he almost entirely neglected discussing her past medications. These are all factors that the ALJ should consider under 20 CFR § 404.1529. The ALJ did cite evidence that arguably explores how intense, persistent, and limiting most of Ramírez's symptoms are, but he failed to explain the significance of such evidence

beyond his conclusory comments that overall, Ramírez had "normal findings" and a "stable" condition. Again, the ALJ failed to connect these comments to his analysis.

In short, the ALJ's evaluation of the record and resultant RFC determination needs to be revisited.

The final issue is whether the ALJ's flawed evaluation of the record constituted harmless error. There is little evidence in the record that clearly supports relevant aspects of the ALJ's RFC determination. For instance, none of Ramírez's treating physicians said anything to the effect that she could sit or stand for long periods of time without suffering pain, discomfort, or health consequences. The only individuals who directly comment on Ramírez's ability to sit or stand for long periods of time are the two consultants who determined that Ramírez was not disabled. Indeed, the Commissioner contends that the opinions of the consultants may constitute substantial evidence in support of an ALJ's decision. This is theoretically true, but the opinions of the consultants are not entitled to such weight here. The Commissioner cites *Berrios-Lopez v. Sec'y of Health and Hum. Servs*., 951 F.2d 427, 431 (1st Cir. 1991) in support of her proposition, but the case arguably suggests that the ALJ's RFC ruling re Ramírez should be reversed. In *Berrios-Lopez*, the First Circuit recognized precedent to the effect that "a written report submitted by a non-testifying, non-examining physician who merely reviewed the written medical evidence could not alone constitute substantial evidence . . . ." *Id*. The court, however, concluded that "[this] principle . . . is by no means an absolute rule." The court called the *Berrios-Lopez* case a "close question," but noted that there was "more in the way of subsidiary medical findings to support [one physician's] conclusions concerning residual functional capacity than is customarily found in the reports of consulting, non-examining physicians." *Id*. The court noted that this is because "[s]uch reports often contain little more than brief conclusory statements or the mere checking of boxes denoting levels of residual functional capacity, and accordingly are entitled to relatively little weight. Here, by contrast, [the physician] at least briefly mentions all of claimant's alleged impairments and states medical conclusions as to each." *Id*. The court also found that since the physicians' reports were prepared shortly in advance of the ALJ hearing, "there is every indication

that [the] physicians had available to them most, although not all, of the medical evidence for their review." *Id*. However, in the present case the consultants' reports are cursory, providing only brief conclusory statements, almost no analysis, and (in particular) providing no direct analysis of Ramírez's ability to sit for six hours a day. Additionally, over two years of arguably significant medical findings came into being after the last consultant's report was finished but before the ALJ hearing. As a result, the opinions of the consultants do not constitute substantial evidence in support of the ALJ's RFC determination, though they certainly merit some level of consideration.

On the other hand, as noted above, the ALJ has acknowledged that Ramírez suffers from several severe impairments, ones that could reasonably cause the symptoms that she complains of that cause her trouble when sitting. Tr. 116. Ramírez has also provided medical findings that came out after the consultants determined she was not disabled that note she had further problems with (among other things) anemia, Tr. 967, 1067, hypertension, Tr. 1156, an atrophic kidney, Tr. 1042, loss of strength, Tr. 1145-46, balance problems, *id*., ecchymotic lesions in her lower extremities, *id*., and worsening kidney disease, Tr. 1137. The ALJ made little reference to these findings in his assessment of Ramírez's RFC. The determination that Ramírez has the RFC to sit for at least six hours of an eight-hour workday therefore has not been substantiated.

Though this court's review is limited to determining whether the Commissioner and his delegates employed the proper legal standards and found facts upon the proper quantum of evidence, the Commissioner's findings of fact here were not supported by substantial evidence. There is a realistic possibility that the ALJ could have reached a different decision if the ALJ had analyzed Ramírez's RFC differently. The ALJ's finding is not necessarily wrong, but it has also not been fully justified. In order to avoid reversal, the ALJ would have needed to adequately connect his conclusions to his analysis, explain what "largely normal findings" means in relation to Ramírez, clarify how possessing a "stable condition" supports the notion that Ramírez has the full RFC for sedentary work, and either justify granting "significant weight" to the opinion of a non-treating psychologist who only testified regarding her field of expertise or explain how his RFC finding holds up even if the psychologist's opinion is irrelevant. Since it is still unclear how

the ALJ came to his conclusions and how those conclusions connect to the ALJ's ultimate conclusion regarding Ramírez's RFC, remand is necessary.

### CONCLUSION

For the foregoing reasons, the Commissioner's decision is **VACATED** and **REMANDED** for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 22nd day of September, 2021.

S/ *Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge